TODD KIM, Assistant Attorney General
Environment & Natural Resources Division
CHRISTIAN H. CARRARA,
Trial Attorney (NJ Bar No. 317732020)
Wildlife & Marine Resources Section
United States Department of Justice
Ben Franklin Station
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 598-9736
Fax: (202) 305-0275
Email: christian.carrara@usdoj.gov

*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY**, <br><br> Plaintiff, <br><br> v. <br><br> **DEBRA HAALAND,** in her official capacity as Secretary of the U.S. Department of the Interior, and **MARTHA WILLIAMS**, in her official capacity as Director of the U.S. Fish and Wildlife Service. <br><br> Defendants. | No. 1:22-cv-00335-DAD-BAK |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**PAGE**

**INTRODUCTION** ........................................................................................................... 1

**ARGUMENT** .................................................................................................................. 2

    I.   The Court has broad equitable discretion over injunctive relief. ................................ 2

    II.  The Service's Workplan best advances the goals of the ESA. ........................................ 3

    III. Plaintiff fails to demonstrate why a departure from the Service's carefully planned Workplan is warranted. ........................................................................................ 6

    IV. Plaintiff's proposed remedy cannot be achieved without undermining the Workplan and the ESA's conservation goals that it was designed to advance. ........................... 12

**CONCLUSION** ............................................................................................................... 14

# TABLE OF CONTENTS

**CASE** **PAGE**

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987) ........................................................................................................... 2

*Biodiversity Legal Found. v. Badgley*,
  1999 WL 1042567 (D. Or. Nov. 17, 1999) ............................................................... 8, 11, 12

*Colo. River Cutthroat Trout v. Kempthorne*,
  448 F. Supp. 2d 170 (D.D.C. 2006) ................................................................................ 8, 11

*Ctr. for Biological Diversity v. Haaland,*
  2021 WL 4169567 (N.D. Ill. Sept. 14, 2021) ..................................................................... 7, 8

*Ctr. for Biological Diversity v. Norton*,
  163 F. Supp. 2d 1297 (D.N.M. 2001) .............................................................................. 8, 9

*Nat'l Wildlife Fed'n v. Espy,*
  45 F.3d 1337 (9th Cir. 1995) ............................................................................................... 2

*NRDC v. Train*,
  510 F.2d 692 (D.C. Cir. 1974) ............................................................................................. 2

*Save Our Springs v. Babbitt*,
  27 F. Supp. 2d 739 (W.D. Tex. 1997) ......................................................................... 8, 9, 10

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 15 (1978) .............................................................................................. 2, 4, 9, 10

*W. Coal Traffic League v. Surface Transp. Bd.*,
  216 F.3d 1168 (D.C. Cir. 2000) ........................................................................................... 3

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ....................................................................................................... 2, 3

**STATUTES**

16 U.S.C. § 1533(b)(1)(A) .................................................................................................. 10

16 U.S.C. § 1533(b)(3)(A) .................................................................................................. 10

16 U.S.C. § 1533(h)(3) ......................................................................................................... 6


**FEDERAL REGULATIONS**

81 Fed. Reg. 49,248 (July 27, 2016) ..................................................................................... 4

86 Fed. Reg. 32,241-32,242 (June 17, 2021) ........................................................................ 6

87 Fed. Reg. 27,152, 26,158 (May 3, 2022) ......................................................................... 6

H.R. Rep. No. 105-825, 1998 WL 751396 ......................................................................... 12

**INTRODUCTION**

Plaintiff's requested remedy would upend the careful balance established in the U.S. Fish and Wildlife Service's ("Service") listing program and would require pushing back the completion of other already-pending statutory listing actions that the Service has determined have a higher conservation priority. Requiring the Service to complete the Temblor legless lizard 12-month finding within nine months of the Court's order, as Plaintiff requests, would topple the Service's carefully designed, comprehensive National Listing Workplan ("Workplan") and subvert the very conservation purposes that listing deadlines under the Endangered Species Act ("ESA") are intended to promote.

As Defendants' demonstrated in their Cross-motion, Plaintiff underestimates the amount of work required to complete the 12-month finding for the Temblor legless lizard. To do so, the Service must: (i) finish its status review by compiling and synthesizing scientific and commercial data to accurately assess the species' status; (ii) conduct peer review of the assessment; (iii) hold recommendation team meetings; (iv) draft a 12-month finding that reflects the best scientific and commercial data available and that applies the statutory and regulatory standards to those data; and (v) obtain management, legal, and departmental reviews. And Plaintiff's assessment does not factor in the many other listing actions the Service must complete between Fiscal Years ("FYs") 2022 through 2027. The Service's proposed remedy—requiring that the Service submit to the Federal Register the 12-month finding for the Temblor legless lizard on or before April 30, 2026—offers sufficient latitude to complete these steps. In doing so, it prevents shuffling an already taxing workload, maintains a conservation-based balance in the Service's ESA-listing program, and allows the Service the time to complete a thorough and defensible finding that is based on the best scientific and commercial data available. This remedy is not only equitable, but it reinforces the predictability of the Workplan and best advances the goals of the ESA. Plaintiff's arguments to the contrary simply highlight its disagreement with the policy decisions that the Service made after recognizing the impossibility of meeting all its statutory deadlines for listing and critical habitat actions given Congress's decision to place hard limits on the listing program's

annual expenditures. Further, none of Plaintiff's arguments reduce the Court's broad equitable discretion to create a remedy that preserves the reasonable balance struck by the Service's Workplan.

## **ARGUMENT**

Although Plaintiff insists that the Service be required to make a finding within nine months of the Court's order, granting Plaintiff's requested relief would return the Service to a chaotic era of unpredictable and inefficient ESA implementation. The Court should therefore reject Plaintiff's request to reprioritize the Service's already taxing and carefully managed ESA listing workload.[1]

### I. The Court has broad equitable discretion over injunctive relief.

This Court has broad equitable discretion in fashioning an appropriate remedy for a missed statutory deadline. *NRDC v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1974). Even where there is "an absolute statutory obligation," "[u]nless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 310-11, 313 (1982) (citations omitted); *see also Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542-44 (1987). Indeed, as the Ninth Circuit determined in *Nat'l Wildlife Fed'n. v. Espy*, "[a]lthough the district court has power to do so, *it is not required to set aside every unlawful agency action*. The court's decision to grant or deny injunctive or declaratory relief under [the] APA is controlled by principles of equity." 45 F.3d 1337, 1343 (9th Cir. 1995) (emphasis added) (citations omitted). Neither the APA nor the ESA divests the Court of its authority to consider the effect a grant of injunctive relief would have on "the trend toward … extinction" of other higher-priority species awaiting listing consideration. *Tenn. Valley Auth. v. Hill*, 437 U.S. 15, 184 (1978).

Despite Plaintiff's suggestion to the contrary, Pls.' Reply Mem. in Support of its Mot. for Summ. J. at 3-5 (hereinafter "Pls.' Reply"), ECF No. 26, a mandatory duty does not in itself

---

[1] But for a handful of additional responses outlined below, Defendants largely rely on the briefing and declarations already submitted. *See* ECF Nos. 21, 22, 22-1. 22-2, 22-3, 22-4.

FED. DEFS.' REPLY IN SUPPORT OF THEIR
CROSS-MOTION FOR SUMMARY JUDGMENT          2

abrogate the power of a court to exercise equitable discretion or to consider the effect a grant of injunctive relief would have on accomplishing the purpose of the statute. *Weinberger*, 456 U.S. at 310-11, 313; *see also W. Coal Traffic League v. Surface Transp. Bd.*, 216 F.3d 1168, 1175 (D.C. Cir. 2000) ("Neither the statute nor the legislative history give any indication that the Congress considered compliance with the timeline in [statute governing review of railroad merger applications] more important than the substantive purposes for which the Board reviews merger applications"). Thus, the requirement that the Service issue a 12-month finding is enforceable but it is still subject to the equitable discretion of the courts. And despite Plaintiff's protestations, recognition of the court's equitable discretion does not convert the Service's duty under Section 4(b)(3)(B) into a discretionary one. *Cf.* Pls.' Reply at 1 (contending, inaccurately, that "[i]n effect, the Service argues that a nondiscretionary deadline is *actually* discretionary") (emphasis in original).[2] Indeed, several courts have recently recognized the court's equitable discretion in fashioning an appropriate remedy in ESA citizen-suit cases. *See, e.g.*, Order, *Ctr. For Biological Diversity v. U.S. Fish & Wildlife Serv.*, No. 4:19-cv-354 (D. Ariz. Nov. 24, 2020), ECF No. 31.; *WildEarth Guardians v. Haaland*, No. CV-20-1035, 2021 U.S. Dist. LEXIS 188122 (D.D.C. Sept, 30, 2021); *Ctr. for Biological Diversity v. Haaland*, No. 20 C 1227, 2021 U.S. Dist. LEXIS 174259 (N.D. Ill. Sept. 14, 2021); *see also* Defs.' Brief at 8, n.3.

## II. The Service's Workplan best advances the goals of the ESA.

---

[2] Nor do Defendants argue that the ESA listing deadlines are in any way discretionary; rather, in light of the impossibility of meeting the statutory deadlines for all of the listing actions that are "on deck," Defendants have taken steps to prioritize and schedule those actions—rationally and transparently—so that it can best meet the conservation purposes of the Act. Plaintiff spills much ink suggesting that the Service is "footdragging," simply "would prefer not to" comply with the ESA's listing deadlines, and—incredulously—created the listing process as "a mere continuance of the Service's long-standing history of avoiding compliance with the ESA." Pls.' Reply at 1, 4, 8. Plaintiff, however, does not dispute the taxing workload before the Service or the impossible position Congress has placed it in; it simply prefers its own prioritization and listing policy. *See generally* Pls.' Resp. to Defs.' Statement of Undisputed Facts, ECF No. 25; *see also* Pls.' Reply at 6 (protesting the Service's "scientific studies and [] bureaucratic process rife with discretionary reviews").

FED. DEFS.' REPLY IN SUPPORT OF THEIR
CROSS-MOTION FOR SUMMARY JUDGMENT        3

After many lawsuits had required the Service to recalibrate its listing and critical habitat workload based on priorities imposed by various plaintiffs and the court orders they obtained, in 2016 the Service developed a comprehensive and systematic methodology to prioritize the work of the listing program in light of the program's limited resources and ever-increasing workload. *See Methodology for Prioritizing Status Reviews and Accompanying 12-Month Findings on Petitions for Listing Under the Endangered Species Act*, 81 Fed. Reg. 49,248 (July 27, 2016) ("Prioritization Methodology"). The Service stated that it would use the methodology to develop a multi-year National Listing Workplan and that it would "periodically update [the Workplan] as circumstances warrant." *Id.* In the preamble and comment responses on the methodology, the Service explained that although the agency is not always able to complete required determinations within the timeframes provided for in the ESA, this was a result of its overburdened workload and significant resource limitations and that the prioritization methodology reflected the Service's attempt to address this difficult situation through comprehensive workload planning. *See id.* at 49,254 (comment 26). The Workplan stems from years of rational thought, learning from past experiences, and science-based conservation factors. The Workplan enables the Service to prioritize its workload based on the needs of candidate and petitioned species, while providing state wildlife agencies, nonprofit organizations, and other diverse stakeholders and partners greater clarity and predictability about the timing of listing determinations to encourage proactive conservation so that federal protections are not needed in the first place.

The Service's Workplan seeks to maintain balance throughout the listing process by setting aside resources to complete both initial petition findings and proposed and final listing/critical habitat rules (including for candidate species), while allowing sufficient time for thorough and defensible decisions. *See* Frazer Decl. ¶¶ 16-19. The Service cannot maintain the Workplan's balancing if it must shift the conservation-based prioritization for listing species established in the Workplan to devote disproportionate funding and staffing resources to making determinations for species accorded a lower priority or based on a third party's preference. Further, Plaintiff's request to upend the Service's Workplan, Pls.' Reply at 14, ignores that 12-

month petition findings are only an initial step in the listing process and alone do not result in the listing of species and the extension of protections under the ESA. Frazer Decl. ¶ 22; *see also* Fris Decl. ¶¶ 6-24. The Workplan allows the Service to allocate its limited resources appropriately so that litigation-driven deadlines for petition findings do not overwhelm the limited resources available to undertake rulemakings to propose and finalize listing decisions and propose and finalize critical habitat for species the Service has already found warrant the protections of the ESA, a state of affairs that has occurred repeatedly in the past.

In pursuit of that balance, the current Workplan prioritizes 310 actions, most of which are "new starts" for FYs 2022 through 2027. Frazer Decl. ¶ 17; *see* Fris Decl. ¶¶ 6-25 (explaining the work required to complete a 12-month finding for a "new start"). Of those actions, the Sacramento Fish and Wildlife Office ("SFWO"), the lead office for completing the 12-month finding for the Temblor legless lizard, currently has eleven yet-to-be completed 12-month findings (and potential associated rulemakings), four final listing/proposed critical habitat actions, one revised proposed critical habitat action, and is also assisting with one final listing action. Fris. Decl. ¶ 26. Most of the yet-to-be-completed 12-month findings are for species assigned to "Bin 3," which, under the Prioritization Methodology, have been found to be of higher conservation priority than "Bin 5" species like the Temblor legless lizard. *See* Fris Decl. ¶ 3 (explaining the Prioritization Methodology for each "Bin" and why the Temblor legless lizard was placed in "Bin 5"); *see also* ECF No. 22-3 (listing actions and corresponding bin numbers currently on the Workplan). Work on all of these species will no doubt require coordination across multiple states and Service regions. Fris Decl. ¶ 28. Moreover, the same SFWO program and staff are responsible for the completion of 83 statutorily required five-year reviews of listed species between FYs 2022 and 2025, and are the lead for the development and finalization of 14 recovery plans through FY 2024. *Id.* ¶ 27; *see also id.* ¶¶ 27-30 (discussing delisting and downlisting actions scheduled between FYs 2022 and 2027, and other actions not yet on the Workplan that the SFWO is responsible for). Because of these various demands, the Court should defer to the Service's reasonable methodology and expert determination of the relative priority of the finding at issue relative to

Fed. Defs.' Reply in Support of their
Cross-Motion for Summary Judgment      5

the determinations for other species the Service is considering whether to protect under the ESA. *See* Order, *Ctr. For Biological Diversity v. U.S. Fish & Wildlife Serv.*, No. 4:19-cv-354 (D. Ariz. Nov. 24, 2020), ECF No. 31; *WildEarth Guardians v. Haaland*, No. CV-20-1035, 2021 U.S. Dist. LEXIS 188122 (D.D.C. Sept. 30, 2021); *Ctr. for Biological Diversity v. Haaland*, No. 20 C 1227, 2021 U.S. Dist. LEXIS 174259 (N.D. Ill. Sept. 14, 2021).

### III. Plaintiff fails to demonstrate why a departure from the Service's carefully planned Workplan is warranted.

Plaintiff argues that Defendants' proposed remedy inappropriately elevates "agency preferences" above Congressional purpose and mandate. Pls.' Reply at 6. But far from "agency preferences," the Service's Prioritization Methodology and Workplan help allocate its limited budget and resources to prioritize its workload and therefore advance the ESA's purpose and mandate. Indeed, Congress called on the Service to adopt just this type of transparent process for organizing its workload when it included in Section 4(h)(3) the directive that the Service develop "a ranking system to assist in the identification of species that should receive priority review." 16 U.S.C. § 1533(h)(3). In fact, it is Plaintiff who proposes elevating its preferred priorities over the many other species that are already in line for listing determinations and have a higher conservation priority. Yet, Plaintiff provides no reason why the Temblor legless lizard deserves to effectively jump ahead of those species that have been assigned a lower bin number based on information from the 90-day finding, the petition, and other information in the Service's files. Rather, Plaintiff simply states, without support, that the Temblor legless lizard is "imperiled." Pls.' Reply at 1. Meanwhile, the Service—the expert agency entrusted with administering the ESA—has made only an initial threshold determination that, based on the petition, that listing *may* be warranted (*i.e.*, 90-day finding). 90-Day Findings for Two Species, 86 Fed. Reg. 32,241-32,242 (June 17, 2021). In the context of the zero-sum game created by statutory requirements to complete multiple listing actions and the constraint of limited listing resources, taking one listing action precludes taking some other listing action. Thus, in deciding whether to impose injunctive

FED. DEFS.' REPLY IN SUPPORT OF THEIR
CROSS-MOTION FOR SUMMARY JUDGMENT        6

relief for a violation of a Section 4 petition deadline, the interests of one species are pitted against the interests of another.

Plaintiff further argues that the Service could have availed itself of "the ESA's specific provision designed to facilitate prioritization in light of resource constraints—a warranted but precluded finding." Pls.' Reply at 11. This misses the mark for at least two reasons. First, it inappropriately assumes that the Service would arrive at a "positive" 12-month finding that the Temblor legless lizard warrants listing—something the Service has not yet determined. Second, as the court in *Ctr. for Biological Diversity v. Haaland,* 2021 WL 4169567 (N.D. Ill. Sept. 14, 2021), concluded, even if the Service were to determine, based on the best scientific and commercial data available, that the Temblor legless lizard warrants listing, a warranted-but-precluded finding here would not provide protections to the species any sooner and would exacerbate the real and significant workload constraints under which the Service is operating. To make a warranted-but-precluded finding, the Service would need to complete all of the same work required to make a warranted 12-month finding, including the need to (i) finish a status review by compiling and synthesizing scientific and commercial data to accurately assess the Temblor legless lizard's status; (ii) conduct peer review of the assessment; (iii) hold a recommendation team meeting; (iv) draft a 12-month finding that reflects the best scientific and commercial data available and that applies statutory and regulatory standards to that data; and (v) obtain management, legal, and departmental reviews. Fris Decl. ¶¶ 7-10, 15, 22. But with a warranted-but-precluded finding, the Service would suspend the immediate proposal and issuance of a proposed regulation implementing the petitioned action until a later time, at which point the Service would need to consider any new information that has become available since the warranted-but-precluded finding and then repeat some of the same steps it took in reaching the earlier finding. In the interim, the species would not be protected and would be placed on the list of candidate species, without any statutory deadline for taking the next step of proposing to list. The suggestion that a warranted-but-precluded finding would somehow "alleviate the issues [the Service faces] with respect to budgetary constraints, manpower constraints, or the priority of other

FED. DEFS.' REPLY IN SUPPORT OF THEIR
CROSS-MOTION FOR SUMMARY JUDGMENT        7

species" misunderstands the nature of that provision. *Ctr. for Biological Diversity, Inc. v. Haaland*, No. 20 C 1227, 2021 WL 4169567, at *9 (N.D. Ill. Sept. 14, 2021).

Next, Plaintiff unjustly relies on old case law where courts ordered the Service to complete overdue actions in just months. *See, e.g.*, Pls.' Reply at 5-6 (citing *Ctr. for Biological Diversity v. Norton*, 163 F. Supp. 2d 1297 (D.N.M. 2001) ("*Checkerspot Butterfly*"); *Save Our Springs v. Babbitt*, 27 F. Supp. 2d 739 (W.D. Tex. 1997); *Biodiversity Legal Found. v. Badgley*, 1999 WL 1042567 (D. Or. Nov. 17, 1999), *aff'd in relevant part, rev'd in part* 309 F.3d 1166 (9th Cir. 2002); *Colo. River Cutthroat Trout v. Kempthorne*, 448 F. Supp. 2d 170 (D.D.C. 2006); *Marbled Murrelet v. Lujan*, No. C91-522WDR, 1992 U.S. Dist. LEXIS 14645 (W.D. Wash. Sep. 15, 1992); *Ctr. for Biological Diversity v. Kempthorne*, No. C 08-1339 CW, 2008 U.S. Dist. LEXIS 34753 (N.D. Cal. Apr. 28, 2008)).

These cases are quickly distinguishable on their facts. First, they all occurred before the Service began to develop and update the Workplan. In addition, turning first to *Checkerspot Butterfly*, the Service in that case had already drafted a proposed 12-month finding prior to litigation. Thus, all that was required for completion of the 12-month finding was to "(1) supplement the already-drafted proposed 12-month finding with new information on the butterfly and its habitat, and (2) have the 12-month finding reviewed." 163 F. Supp. 2d at 1301. The court noted that the substance of the 12-month finding would not be compromised by a court-ordered deadline given that a proposed finding had "already been drafted." *Id*. In other words, unlike here, the Service was much further along in the process and had already completed the bulk of the work in *Checkerspot Butterfly*.[3] It's worth noting that although the court declined to consider "the Secretary's budgetary crisis caused by judicially-imposed deadlines in other cases," it did recognize that "the Secretary is caught in a quandary. Without sufficient funding or a change in the mandatory tasks required by Congress, the Service cannot fulfill the myriad of mandatory listing duties." *Id*. at 1299-1300, 1301 (citations omitted). It observed that until Congress acts to

---

[3] Plaintiff's reliance on several other cases fails for this same reason. *See* Defs.' Brief at 15 n.6 (distinguishing *Marbled Murrelet*, 1992 U.S. Dist. LEXIS 14645, and *Kempthorne*, 2008 U.S. Dist. LEXIS 34753, from this matter).

FED. DEFS.' REPLY IN SUPPORT OF THEIR
CROSS-MOTION FOR SUMMARY JUDGMENT        8

remedy the impossible task at hand, "tax dollars will be spent not on protecting species, but on fighting losing battle after losing battle in court." *Id*.

The same is true in *Save Our Springs*. There, plaintiffs challenged a failure to issue a final listing determination for the Barton Springs salamander. The Service had issued both a 90-day finding and a 12-month finding with a proposed rule. 27 F. Supp. 2d at 747-48. All that was left was a determination whether to finalize the proposed listing, withdraw the proposed listing, or extend the period for a listing determination for six more months. The Temblor legless lizard is at an earlier stage in the listing process than was the case for the Barton Springs salamander in *Save Our Springs*. Here, the Service continues to compile biological data on the Temblor legless lizard. Fris Decl. ¶ 5. This data is then added into a comprehensive Species Status Assessment ("SSA") that serves as the biological foundation for all ESA decisions (*e.g.*, listing, consultations, grant allocations, permitting, and recovery planning). *Id*. ¶ 6. These documents serve as biological risk assessments to guide the Service, which is required under the ESA's mandate to use only the best scientific and commercial data available to make listing decisions. *Id*. ¶ 7. Although the SSA does not result in a decision directly, it provides the best available scientific information, and the Service can then evaluate that information based on the standards that guide ESA decisions. *Id*. Plaintiff, nevertheless, contends that the Service's listing process is a "myriad [of] internal hoops" and "self-imposed bureaucratic morass." Pls.' Reply at 7. Plaintiff would inexplicably have the Service issue a 12-month finding without the preparation of a SSA, and, ultimately, forego a necessary part of the decisionmaking process. *See id.* at 8 (suggesting that because "there is *no legal requirement* for the Service to complete a formal SSA," the Service should nix it for a faster process) (emphasis in original). However, if the Service were to rush completion of the Temblor legless lizard's SSA—or skip it entirely—to expedite a 12-month finding, it would undermine not only the agency's ability to produce a legally-defensible decision, but also the conservation goals of the ESA.[4] *See* Defs.' Brief at 8.

---

[4] Contrary to Plaintiff's suggestion, the California Department of Fish and Wildlife's recommendation that "list[ing] the Temblor legless lizard as threatened or endangered may be warranted [under the California ESA]" does not curtail the Service's need for an SSA. Report to

FED. DEFS.' REPLY IN SUPPORT OF THEIR
CROSS-MOTION FOR SUMMARY JUDGMENT         9

Further, Plaintiff incorrectly argues that the ESA "require[s] the Service to make 12-month findings based 'solely' on available data." Pls.' Reply at 10. *See also id*. at 7 ("the Service's listing process now bears little resemblance to Congress' carefully crafted ESA Section 4 listing procedures . . ."). A review of the relevant statutory provision quickly disproves this argument and shows that the Secretary shall also make such a determination "after conducting [1] a review of the status of the species and [2] after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species . . . ." 16 U.S.C. § 1533(b)(1)(A); *id.* § 1533(b)(3)(A) ("If such a petition is found to present such information, the Secretary shall promptly commence a review of the status of the species concerned."). Thus, the ESA contemplates that the Service produce a legally defensible decision after conducting a thorough review of the species' status. And, Plaintiff does not deny that a thorough review is required. Pls.' Reply at 9 ("a thorough review of the basis for listing should be expected"). Plaintiff simply wants to have its cake and eat it too by suggesting that the Service should make a rushed, but somehow thorough, decision on the Temblor legless lizard.

Meanwhile, *Colorado River Cutthroat Trout* had nothing to do with 12-month findings. Instead, it focused on a challenge to the merits of a 90-day finding, which is the first step in the listing process and requires significantly less than a 12-month finding from the Service in terms of time and resources. In fact, 90-day findings call for the Service to determine whether *the petition alone* presents substantial information indicating that a listing may be warranted. 16 U.S.C. § 1533(b)(3)(A). This is in contrast to the extensive work done by the Service to gather and analyze the best scientific and commercial data available to inform 12-month findings. *See* Fris Decl. ¶¶ 6-25. Plaintiff also mischaracterizes the court's order in *Colorado River Cutthroat*

---

the Fish and Game Commission, at 21. *See generally* https://fgc.ca.gov/Meetings/2022 (last accessed August 4, 2022); Pls.' Reply at 8-10. Rather, the Department of Fish and Wildlife noted in its recommendation that there is "difficulty in detecting [the Temblor legless lizard], as well as its new species designation and lack of species-specific research, [which] limits the available information upon which to assess abundance and population trends." *Id*. Thus, rather than supporting Plaintiff's suggestion that no SSA is necessary, this report actually underscores the need for an SSA.

FED. DEFS.' REPLY IN SUPPORT OF THEIR
CROSS-MOTION FOR SUMMARY JUDGMENT          10

*Trout*. Rather than order the publication of a 12-month finding in nine months as Plaintiff suggests, the court ordered that the Service conduct a *full status review* of the Colorado River cutthroat trout within nine months with instructions that the Service "issue a 12-month finding … *after* conducting a status review and requesting public comment." 448 F. Supp. 2d at 179 (emphasis added). The court did not impose a date certain to issue the 12-month finding. *Id*.

Moreover, the Service's workload under the ESA has risen dramatically in the intervening 15-20 years since these cases were decided. The remaining cases Plaintiff relies on also predated the Workplan, and were decided during a period of chaotic and lopsided implementation of the ESA, driven largely by court orders.[5] Similarly, the charts Plaintiff relies on are also outdated and do not accurately reflect the current review process of listing actions. *Compare* Pls.' Brief, Exh. 1, ECF No. 26-1, with Fris Decl. ¶¶ 22-24 (discussing different reviewing officials, clearance time, and critical habitat analyses than those presented by Plaintiff). Moreover, Plaintiff exaggerates the process, stating that the draft SSA is peer reviewed "various times," and reviewed by partners and other officials "several more times" in accordance with "the flowchart process." *See* Pls.' Reply at 8. Not only is the flowchart Plaintiff refers to outdated and not in current use, but it does not reflect the SSA process, where there is generally only one opportunity for peer and partner review.

Since introducing the Workplan, the Service, through notice-and-comment rulemaking, produced a reasonable, conservation-based prioritization methodology to tackle the reality of a heavy workload with insufficient resources and has created a Workplan based on that methodology. The resulting Workplan is transparent, balanced, and a reasonable solution to a nearly impossible situation. This is a much different situation from the inapposite cases cited by Plaintiff.

---

[5] Indeed, in one of those pre-Workplan cases, *Biodiversity Legal Found. v. Badgley*, the court lamented the untenable position the Service was placed in prior to the Workplan, stating, "[f]orcing the agency to respond to multiple court orders does not further the purpose of the ESA and may cause the decline of species that do not have an environmental organization advancing their causes through litigation." 1999 WL 1042567 (D. Or. Nov. 17, 1999), *aff'd in relevant part, rev'd in part* 309 F.3d 1166 (9th Cir. 2002).

FED. DEFS.' REPLY IN SUPPORT OF THEIR
CROSS-MOTION FOR SUMMARY JUDGMENT        11

**IV.  Plaintiff's proposed remedy cannot be achieved without undermining the Workplan and the ESA's conservation goals that it was designed to advance.**

Plaintiff proposes a remedy that will be impossible to achieve without siphoning resources away from the conservation-based priorities identified in the Service's Workplan and away from the dozens of highly imperiled species already determined to warrant listing in favor of the Temblor legless lizard's petition finding. Frazer Decl. ¶ 23. By setting deadlines, Congress made it clear that timely petition findings are important. However, Congress also anticipated that the system could become overloaded, and directed the Service to "utilize a scientifically based priority system to list and delist species, subspecies, and populations based on the degree of threat, and proceed in an efficient and timely manner." H.R. Rep. No. 97-835, *21 (1982) (Conf. Rep.), *reprinted at* 1982 U.S.C.C.A.N. 2860, 2862 (1982). It also recognized the possibility that for some petitions, "the existence of pending or imminent proposals to list species subject to a greater degree of threat would make allocation of resources to such a petition unwise." *Id*. Other legislative history accords. The Department of the Interior supported ESA Section 4's construction: "this approach would expedite consideration of petitions, while still ensuring that those species most urgently in need of protection receive first priority for listing." 1982 U.S.C.C.A.N. 2840 (1982). Congress also recognizes, through imposing yearly spending caps that keep listing actions from overtaking the Service's budget, that the Service is unable to do all of the work in its backlog and must prioritize its listing work.[6] Frazer Decl. ¶¶ 4-9. Thus, the

---

[6] The limitation rider cases, which concerned the ESA listing moratorium, also provide context for Congress's subsequent decision in 1997 to place hard limits on expenditures for the listing program, thereby in effect underfunding the program, so as to protect funding appropriated for the Service's other programs. *See* H.R. Rep. No. 105-337, at 56 (1997) (Conf. Rep.), *as reprinted in* 1997 U.S.C.C.A.N. 2183, 2189-91; H.R. Rep. No. 105-825, 1998 WL 751396 at *1187 (1998) (Cof. Rep.); *see also* Benjamin Jesup, *Endless War or End this War? The History of Deadline Litigation Under Section 4 of the Endangered Species Act and the Multi-District Litigation Settlements*, 14 Vt. J. Env't L. 327, 350 (2013). This is not ancient history. Congress continues to express the same concerns, and enact similar appropriations caps, today. *See* FY22 appropriation cap: H.R. No. 117-2471, at 302 (2022), https://www.congress.gov/117/plaws/publ103/PLAW-117publ103.pdf (last accessed August 4, 2022).

FED. DEFS.' REPLY IN SUPPORT OF THEIR
CROSS-MOTION FOR SUMMARY JUDGMENT       12

Workplan's objective of maintaining balance and order in the system aligns with Congressional intent.

Plaintiff's proposed remedy for the Temblor legless lizard 12-month finding would undermine the goals and balance of the Service's Workplan at the expense of other species that the Service has determined are highly imperiled. The measured Workplan spreads out numerous deadlines until FY 2027. Frazer Decl. ¶ 17. Of the 310 actions on the Workplan, most are "new starts" which will require status reviews (and listing/critical habitat rules if the determination is to list as endangered or threatened) as well as but there are also numerous ongoing status reviews and rules. *Id*. ¶¶ 17-18. Notably, 12-month findings require significant resources, Fris Decl. ¶¶ 6-24; Frazer Decl. ¶ 22, and the lead office responsible for the Temblor legless lizard finding already has eleven that are yet to be completed, in addition to numerous other actions through FY 2027. *See* Fris Decl. ¶¶ 26-30. And so, if ordered to complete the Temblor legless lizard finding in the nine months following entry of the Court's order, as Plaintiff requests, the Service would have to immediately reprioritize its carefully planned workload to the detriment of species that the Service knows are in great need of review and protection. Again, Plaintiff has provided nothing beyond bare allegations to support its argument that the Temblor legless lizard is imperiled. And, even if it were accurate, the same can be said of the other species awaiting ESA listing actions. Plaintiff's preferred reshuffling would be problematic for at least four reasons. First, the Service does not anticipate having available funding or staff resources to complete this finding earlier than FY 2026.[7] Frazer Decl. ¶¶ 23-24; Fris Decl. ¶ 31. Second, imposing a new deadline in the Workplan at this time, without the additional resources needed to complete the added work, will undermine the comprehensive and balanced Workplan. Frazer Decl. ¶ 23. Adding more to this significant workload, without providing the Service adequate latitude to slot it into its existing and detailed multi-year Workplan, would be counterproductive and would require the Service to delay work

---

[7] Plaintiff's contention that "work on recovery actions does not preclude the availability of resources for completing new listing work," Pls.' Reply at 13 n.7 (citing 87 Fed. Reg. 27,152, 26,158 (May 3, 2022)), misses a crucial element, which dooms its argument: while the recovery workload may have a separate budget, it does not have a separate staff.

on other conservation actions that the Service has already determined have a high priority in the Workplan. Frazer Decl. ¶¶ 23-24. Third, Plaintiff's proposed remedy would lead to a rushed decision and would not allow adequate time to finish gathering and analyzing the required science and data. Fris. Decl. ¶ 5. Lastly, Plaintiff's remedy would cut short or eliminate the Service's ability to obtain peer review of the SSA and deny the Service Director and Department sufficient time for their required review before the finding can be submitted to the Federal Register. Frazer Decl. ¶¶ 23-24; Fris Decl. ¶¶ 6-10, 29, 31.

## **CONCLUSION**

The Service does not dispute its statutory obligation to make a 12-month finding on the Temblor legless lizard. Nor does it dispute that it missed this deadline. The Service therefore does not oppose a remedy directing it to make the 12-month finding by a reasonable and feasible date set by the Court. But the remedy requested by Plaintiff is not feasible given the time needed to complete the required scientific steps as mandated by the ESA and the necessary legal and policy reviews. Given these constraints and the present and anticipated funding levels of the ESA workload, the Court should exercise its equitable discretion to order the Service to submit the finding to the Federal Register by April 30, 2026. This remedy offers the Service sufficient latitude to integrate these added demands into an already taxing workload based on the limited funding provided by Congress; maintains balance, predictability, and the conservation-based focus in the Service's ESA listing program; and allows the Service the time to complete a thorough and defensible finding based on the best available science.

Dated: August 4, 2022    Respectfully submitted,

TODD KIM, Assistant Attorney General
S. JAY GOVINDAN, Acting Section Chief
MEREDITH L. FLAX, Assist. Section Chief

*/s/ Chris Carrara*
CHRISTIAN H. CARRARA,
Trial Attorney (NJ Bar No. 317732020)

FED. DEFS.' REPLY IN SUPPORT OF THEIR
CROSS-MOTION FOR SUMMARY JUDGMENT     14

U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station. P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 598-9736
Fax: (202) 305-0275
Email: christian.carrara@usdoj.gov

*Attorneys for Defendants*

FED. DEFS.' REPLY IN SUPPORT OF THEIR
CROSS-MOTION FOR SUMMARY JUDGMENT         15

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of California by using the CM/ECF system, which will serve a copy of the same on the counsel of record.

*/s/ Chris Carrara*